Richard A. Ramler
Ramler Law Office, P.C.
202 West Madison
Belgrade, MT   59714
Telephone (406) 388-0150
Telefax (406) 388-6842
RichardRamler@aol.com

Jon D. Robinson
Bolen, Robinson & Ellis, LLP
202 South Franklin Street, 2nd Floor
Decatur, IL  62523
Telephone (217) 429-4296
Telefax (217) 329-0034
jrobinson@brelaw.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| RICHARD BARBER and BARBARA BARBER, | Cause No. 2:12-cv-00043-BU-DLC |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' PRELIMINARY PRETRIAL STATEMENT** |
| REMINGTON ARMS COMPANY, INC., SPORTING GOODS PROPERTIES, INC., And E.I. DuPONT DE NEMOURS AND COMPANY, | |
| Defendants. | |

### A. BRIEF FACTUAL OUTLINE OF THE CASE

Richard and Barbara Barber filed this action against Defendants alleging claims for defamation, intentional infliction of emotional distress and civil conspiracy. Barbers filed their Complaint and Demand for Jury Trial on July 2, 2012. (Doc. 1). Defendants filed a Motion to Dismiss and Brief in Support on September 4, 2012. (Docs. 8 & 9). Barbers filed a Response to the Motion to Dismiss and an Amended Complaint on September 21, 2012. (Docs. 12 & 13). The Court entered its Preliminary Pretrial Conference Order on October 1, 2012. (Doc. 16). The preliminary pretrial conference is scheduled for October 30, 2012.

### B. ISSUES REGARDING JURISDICTION AND VENUE

Plaintiffs are aware of no issues regarding jurisdiction or venue at this time.

### C. FACTUAL BASIS OF EACH CLAIM

Richard and Barbara Barber's 9-year-old son Gus died after being struck by a bullet that was fired from a Remington Model 700 bolt action rifle without the trigger being pulled. The rifle discharged without a trigger pull when Barbara Barber released the safety to unload the rifle. The bullet from the rifle passed through a horse trailer before striking Gus. Gus had moved to the other side of the horse trailer seconds before the rifle discharged and was out of sight.

Defendants have known that Remington bolt action rifles containing the "Walker" fire control can fire without a trigger pull since at least 1947 according to

Remington's internal documents. Specifically, Remington has known since the conception of the design of the rifle's fire control (in the late 1940's) that this fire control could fire absent a trigger pull when either the rifle's safety is moved from the "safe" to the "fire" position, when the bolt is cycled, or when the rifle is bumped or jarred.

The Walker fire control is uniquely designed because it employs a "trigger connector." The "trigger connector" is "resiliently mounted" on the trigger body and separates from the trigger body during firing. The separation of the trigger connector and the trigger body can cause the rifle to fire in the absence of a trigger pull. This can happen to every rifle equipped with the Walker fire control. These discharges without a trigger pull are unpredictable and in many instances cannot be duplicated.

The unexpected discharge of a high powered rifle without a trigger pull is obviously a dangerous condition. The Defendants have not warned about the rifle's propensity to fire without a trigger pull. Defendants have concealed this fact from purchasers of the rifles. Defendants affirmatively mislead purchasers about the safety of the rifles and have actively concealed the functional defect, ultimately defaming Plaintiffs as part of Defendants' deliberate cover-up of their defective product.

Unintended discharges have been the subject of thousands of customer complaints and hundreds of claims against Defendants for injury or death to persons and property since the rifle was introduced into the market place. In most of the complaints, the gun handler has vehemently denied that the trigger was pulled. Remington always claims that it was the handler's fault. Despite Remington's public denial of any wrongdoing, the injuries and damage to property claims received by the company regarding the

unexpected and unintended discharges have been so numerous that Remington actually has considered recalling the rifles on more than one occasion.  Remington has gone so far as to fashion language to warn gun owners that, "the gun may accidentally fire when you move the safety from the "safe" position to the "fire" position, or when you close the bolt."  However, Remington never published the proposed warning, and instead continued to tell consumers that it was "unable to duplicate" the customer's complaint.

Remington has spent much of the last three decades engineering and developing a new fire control design to fix this functional defect.  In 2006, Remington introduced a new fire control, the "safety pivoted link ("SPL") or "X-Mark Pro".  The new design eliminates the "trigger connector" and has a "trigger blocking safety" that forces full engagement of the trigger and sear upon operation of the safety.

Since the death of Gus, Richard (as a media researcher and educator) has worked to obtain and review thousands of pages of Remington's internal documents.  Based on the incriminating documents he has reviewed, Richard has sought to increase public awareness about the unreasonable dangers of Remington rifles containing the Walker fire control.  Richard has become widely known as an accredited authority regarding Remington's internal documents and the functional defects in Remington rifles that contain the Walker fire control.

Richard was interviewed, and Barbara was filmed, for a CNBC original documentary called, "Remington Under Fire: A CNBC Investigation".  This documentary first aired on October 20, 2010.  Richard was one of the primary

resources for this documentary. The theme of the documentary was that Remington rifles with the Walker fire control are unreasonably dangerous and that Remington's internal documents show that Remington has known this to be the case for decades. Richard and Barbara were featured in the program. Richard, when asked, stated during the documentary that their Remington Model 700 rifle fired when the safety was released, without a trigger pull. He stated that the cause of the discharge was a functional defect involving the rifle. During the program, Richard also stated that he had devoted a great deal of his life learning the truth about the alleged functional defects in Remington rifles, and that Remington's own internal documents show that Remington rifles containing the Walker fire control can, in fact, spontaneously discharge without a trigger pull to inadvertently fire the rifle.

When Richard first watched the CNBC production "Remington Under Fire," he discovered that Remington was still publicly stating that the Walker fire control was safe and reliable. He also learned Remington was still manufacturing bolt action rifles with the Walker fire control, and that Defendants were claiming that no one had ever duplicated the unintentional firing of a Model 700 unless it was modified or not properly maintained. These statements were false and designed to discredit Richard and his prior statements.

After airing of the documentary, Defendants published several responses to CNBC's "Remington Under Fire," including a website located at http://remington700.tv, an Official Statement for CNBC Program Regarding the Model 700, and a Point by Point Response to CNBC "Remington Under Fire." In these responses, Defendants fraudulently, deceptively and falsely state that Remington rifles containing the Walker fire control system can only fire without a trigger pull if they are improperly modified or improperly maintained.

Remington's responses contained the following public statements which Remington knew at the time were false:

> Recently CNBC produced an "expose" claiming that the trigger mechanism of the Model 700 rifle has a deadly design flaw. This claim is demonstrably false.
>
> The Barber rifle had been modified in multiple ways and poorly maintained (rusted action). Even so, in testing by experts for both Remington and the Barber family, the Barber rifle would fire only by pulling the trigger while the safety was in the fire position.
>
> Although a small portion of those millions of users have told the company a Model 700 rifle went off when they didn't intend for it to, both Remington and experts hired by plaintiffs' attorneys have tested accident guns which were alleged to have fired without a trigger pull and neither has ever been able to duplicate such an event on guns which had been properly maintained and which had not been altered after sale.
>
> No scientific test has ever supported the accidental discharge theory of plaintiffs' lawyers and their expert. That's true, even with a gun at the center of the CNBC report. The reporter tells the

compelling story of the Barber family, who lost their son in a hunting accident a decade ago.

But the show never reveals the condition of the gun, which experts found was heavily rusted, with the trigger engagement screw, safety lever, and fire control mechanism all adjusted, or removed and reinstalled.

Even so, experts for both Remington and the family found the Barbers' gun worked properly when it was tested. The supposed flaw could not be repeated.

The gun fired only when the safety was in the fire position and the trigger was pulled, exactly as it was designed to do.

Both Remington and experts hired by plaintiff attorneys have conducted testing on guns returned from the field, which were alleged to have fired without a trigger pull, and neither has <u>ever</u> been able to duplicate such an event on guns which had been properly maintained and which had not been altered after sale.

Each of the tragic and emotional personal injury and death cases cited by CNBC involve a breach of one or more important gun safety rules:

> Failure to keep the rifle pointed in a safe direction
> Failure to properly maintain the rifle
> Altering the rifle's trigger mechanism
> Failure to have the safety engaged when not actively engaged in firing the rifle.

The truth about accidental discharges is clear. These things don't go off by themselves.

These statements above by Remington communicate to the public that the Barber rifle fired because of a trigger pull, or because it was improperly maintained or improperly modified. Defendants are publicly blaming Richard and

*PLAINTIFFS' PRELIMINARY PRETRIAL STATEMENT*                                                                 Page 7

Barbara for the death of their son, Gus.  These statements by Remington also communicate that Richard Barber lied about what he has learned from Remington's internal documents, including what they say about the cause of Remington bolt action rifles firing without a trigger pull, and Remington's knowledge of these dangerous functional defects.  Remington's false public statements have impuned the Barbers' reputation for honesty and integrity.  Defendants have intentionally defamed the Barbers to prevent the disclosure of the truth regarding Remington's knowledge of the dangerous propensity of Remington rifles to fire without a trigger pull.

   Remington's statements that the Model 700 rifles are "safe and reliable," or that they will not fire without trigger pull unless improperly maintained or improperly modified are false.   These statements are fraudulent because Defendants' own records prove these claims are false, and because Defendants intend that the public rely on these false statements.

   DuPont acquired a majority of Remington's common stock in 1933.  At that time, Remington's firearms sales were a distant third behind Winchester and Savage.  DuPont originally considered closing the firearms portion of Remington's business, but continued manufacturing firearms into World War II.  During World War II, DuPont instituted a Reconversion and Modernization Program (R & M Program) at Remington to manufacture a new line of rifles and shotguns to make

Remington profitable.  One of the first projects of the R & M Program was the development of a new bolt action rifle, the Model 721.  The Walker fire control was designed in connection with the development of the Model 721.  The Model 721 was designed with the intent to be the lowest cost rifle in the entire Remington line of products.

DuPont was actively involved with Remington during the development of the Models 721 and 722.  The R & M Committee that was responsible for this program included DuPont engineers and management personnel to oversee the program.  DuPont employees established the budget, and were involved in all aspects of the development of the Model 721.  DuPont engineers participated and controlled the development of the new rifles and shotguns at Remington during this time.

The Model 721 rifle was released in March, 1948.  The Model 722 was introduced shortly thereafter.  The development of the Model 725 was started in 1956 as a result of "a major stumbling block that has developed in the safety design of the Model 721 and 722 which is considered to be inadequate." Remington considered abandonment of the Model 721 and 722 for this reason, or modifying the safety on the Model 721 and 722 to "include the more important features of the Model 725 – a revised safety." Remington never retrofitted the three-position safety to the Models 721 or 722 as recommended. The Model 725

had a three-position safety which permitted the user to unload the rifle with the safety on. The Model 725, with a three-position safety was released to the public in 1958.   Remington continued production of the Models 721, 722 and 725 until the introduction of the Model 700 in 1962, when the Models 721, 722 and 725 were discontinued.

Remington abandoned the prior art of a three-position safety used on the Model 725 during the development of the Model 700 contrary to recommendations to retain it, even though the two-position safety location that was used in the Model 700 was thought to be a "dirt catcher".  The Model 700 series of rifles is still in production today with the same safety design (which was "considered inadequate" in 1956) that was first used on the Model 721 and 722.

In 1979, Newremco, Inc. was incorporated and DuPont acquired 100% of its stock.  Remington was merged into Newremco in 1980.  Newremco then changed its name to Remington Arms Company, Inc.   After DuPont acquired 100% of the common stock of Remington, it operated Remington as a division of DuPont.  DuPont organizational charts show Remington as being controlled as a part of the Finishes and Fabricated Products Division of DuPont.  Board of Director minutes indicate that the authority of the executive branch of Remington was to be reduced "to that of a mere formality."  An executive committee of DuPont controlled and made decisions for Remington.

On December 1, 1993, substantially all of the assets of Remington Arms Company, Inc. were sold to a new corporation under the terms of an Asset Purchase Agreement. The name of the new corporation that purchased the assets was changed to Remington Arms Company, Inc., after the sale. The new Remington Arms Company was owned or managed by Clayton, Dubilier & Rice. What was left of the old Remington Arms Company, Inc. was renamed Sporting Goods Properties, Inc., after the sale. DuPont retained ownership of Sporting Goods Properties, Inc. Sporting Goods Properties, Inc. distributed the proceeds from the sale to DuPont.

DuPont was a party to the Asset Purchase Agreement, and agreed to indemnify the buyer from certain product liability claims under the terms of the Asset Purchase Agreement. DuPont also entered into a Product Liability Services and Defense Coordination Agreement dated December 1, 1993, with the buyer, which is believed to still be in effect   The Defense Coordination Agreement coordinates the defense of product liability claims between DuPont and the new Remington Arms Company. Sporting Goods Properties is named in the agreement, but it has no direct role in the defense of product liability claims.

All of the common stock in Remington Arms Company, Inc. was sold to American Heritage Arms, LLC, on April 4, 2007, under the terms of a Stock

Purchase Agreement.  American Heritage Arms, LLC, is owned by Cerberus Capital Management, L.P.

### D.  THE LEGAL THEORY UNDERLYING EACH CLAIM

Plaintiffs are grounding liability on the following legal theories:

1. Defendants have knowingly and intentionally defamed Richard and Barbara Barber in response to their participation in the CNBC documentary "Remington Under Fire."  The false and defamatory statements have injured the Barbers' reputation for honesty and integrity and have damaged Richard Barber's firearm instruction, training and consulting business.  Defendants' defamatory statements were not privileged when made.  Defendants have continued to publish the defamatory statements against the Barbers.

2. Defendants have intentionally inflicted severe emotional distress on Richard and Barbara Barber by knowingly and intentionally defaming them in response to their participation in the CNBC documentary "Remington Under Fire."

3. Defendants have conspired to defame and discredit the Barbers to prevent the public from learning the truth about Remington's knowledge of this by concealing the dangerous propensity of Remington bolt action rifles containing the Walker fire control to fire without a trigger pull.

4. Defendants have undertaken their actions deliberately and with malice, justifying the imposition of punitive damages.

## E.   COMPUTATION OF DAMAGES

1.   <u>Economic losses</u>. Plaintiffs' damages calculation is based in part upon Plaintiffs' lost earnings for the period since publication of the CNBC program in October, 2010.  Plaintiffs have suffered loss of earned income from Richard Barber's consulting and firearms safety instruction business.  Based on a comparison of Richard Barber's earned income from before October, 2010, and since that time, Plaintiffs submit they have suffered losses and damages as a result of Defendants' defamation.  Plaintiffs believe this loss now totals at least $25,000 per year, and is ongoing.  This loss and damage is increasing because Plaintiffs continue to suffer losses in business.

2.   <u>Emotional damages</u>.  In addition to their loss of earned income as a result of Defendants' defamation, Plaintiffs have suffered, and continue to suffer, non-economic damages to their reputation, and they have suffered ridicule and disrespect as a result of Defendants' false statements that attack their credibility.  These damages are non-specific.  Plaintiffs submit that this category of their damages exceeds $1,000,000.

3.   <u>Punitive damages for actual malice</u>. Because Defendants' wrongful conduct (defamation) is willful and malicious, punitive damages should be awarded in this case.  Based on current case law regarding limitations on punitive damages, Plaintiffs will seek a punitive damage award not to exceed nine (9) times

the total award for compensatory damages.  (See *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (S. Ct. 2003).  Because the most important indicium of the reasonableness of a punitive damage award is the degree of reprehensibility of the defendant's conduct, Plaintiffs submit that in this case, the punitive damage award be the maximum allowable award.  *Id*. at 419.

### F.  RELATED STATE OR FEDERAL LITIGATION

There have been approximately 150 civil actions filed against Remington for personal injury or death resulting from Remington bolt action rifles firing without a trigger pull. Since Gus Barber's death, there have been roughly 40 more similar claims filed against Defendants as of this time last year. There are currently two cases pending in Montana, *Humphrey v. Remington*, CV-12-122-BLG-RBC, (D. Mont. 2012); and *Barrere v. Remington*, CV-12-136-BLG-RFC, (D. Mont. 2012). There are an estimated dozen other cases currently pending across the United States at this time.

### G.  PROPOSED STIPULATION OF FACTS AND UNDERSTANDING AS TO WHAT LAW APPLIES

1. This Court has jurisdiction over this action under 28 U.S.C. §1332.
2. Venue in this Court is proper.
3. Defendants published the statements attributed to Defendants in the First Amended Complaint.

4.	Plaintiffs understand that Montana law applies to Plaintiffs' claims.

## H. PROPOSED DEADLINES FOR JOINDER OF PARTIES OR AMENDMENT OF PLEADINGS

Plaintiffs propose a deadline of January 2, 2013, to join parties or amend pleadings without leave of Court.

## I. CONTROLLING ISSUES OF LAW SUITABLE FOR PRETRIAL DISPOSITION

Plaintiffs are unaware of any controlling issues of law that are suitable for pretrial disposition at this time.

## J. SETTLEMENT DISCUSSIONS

Prospects for settlement are unknown. There have been no settlement discussions.

## K. SPECIAL PROCEDURES

No special procedures are anticipated.

Respectfully Submitted,

/s/Jon D. Robinson
Jon D. Robinson
Counsel for Plaintiffs

/s/Richard A. Ramler
Richard A. Ramler
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October, 2012, a copy of the foregoing document was served on the following persons by and through the Electronic Case Filing System.

Clerk, U.S. District Court

Robert M. Carlson
Corette Pohlman & Kebe
129 West Park
P.O. Box 509
Butte, Montana 59703

                                        Bolen Robinson & Ellis, LLP

                                        By: /s/ Jon D. Robinson
                                              Jon D. Robinson
                                              Attorney for Plaintiffs