Robert M. Carlson
CORETTE POHLMAN & KEBE
129 West Park Street
P.O. Box 509
Butte, MT 59703
PH    : 406-782-5800
Fax   : 406-723-8919
bcarlson@cpklawmt.com

Attorney for Defendants

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| RICHARD  BARBER  and  BARBARA BARBER, | ) ) |
| Plaintiffs, | ) ) Cause No. CV-12-43-BU-DLC ) ) |
| vs. | ) ) **DEFENDANTS' REPLY BRIEF IN** |
| REMINGTON ARMS COMPANY, INC., SPORTING   GOODS   PROPERTIES, INC., and E. I. Du PONT DE NEMOURS AND COMPANY, | ) **SUPPORT OF MOTION TO** ) **DISMISS FIRST AMENDED** ) **COMPLAINT** ) ) ) |
| Defendants. | ) ) |

## __INTRODUCTION__

Plaintiffs have offered no legally sufficient basis to deny Defendants'
Motion to Dismiss.  Instead, Plaintiffs chose to mischaracterize Remington's actual
statements, cite incorrect legal standards, and fail to explain why their claims
against the same three Defendants were not previously released in 2002.

This Court's task is to determine whether statements made by Remington in response to the CNBC television program support an actionable defamation claim under Montana law. Whether Plaintiffs' claims are barred by the 2002 Release and whether Remington's statements (1) are of and concerning Plaintiffs, (2) carry a defamatory meaning, (3) have an innocent construction and (4) are privileged are questions of law that should be resolved now. The language of the Release will not change. Remington's written and video responses to the CNBC program will not change; nor will their meaning, the context in which they were expressed or the protections they are afforded.

## ARGUMENT

### I.     Plaintiffs Fully Released Defendants from Claims that "in Any Way Grow Out of the Accident[.]"

Plaintiffs are attempting to achieve in this case what they voluntarily relinquished by written agreement in 2002—namely, judicial determinations that the Model 700 rifle is defective and that they are in no way responsible for the accidental death of their son.

Plaintiffs' argument that their defamation claim is "separate from the wrongful death lawsuit" and is not barred by the 2002 Release is contrary to the plain language of the Release. (*See* Doc. 29, "Resp." at p.5). Plaintiffs did not just narrowly release Defendants from the claims made in the "wrongful death lawsuit"; they agreed to release claims they had or might have against these same

Defendants in the future that "*may in any way grow out of the Accident*." (*See* Exhibit D p.2, §1.A) (emphasis added).[1]

"[T]he Accident" was the context of Plaintiffs' appearance on the CNBC program and Remington's response. The operative language of the Release fully and broadly discharged Defendants from claims for damages, including future claims, without regard to the nature of Defendants' alleged conduct or when the conduct occurred, provided that the claim was "in any way" traceable to "the Accident." (*See* Exhibit D p.2, §1.A).[2]

Plaintiffs' reliance on a footnote in *Marder v. Lopez*, 450 F.3d 445, 451 n.5 (9th Cir.1996) is misplaced. (Resp., p.5). The *Marder* plaintiff had previously released all claims of ownership to a film based on her life as a night club dancer, later sought a declaration that she owned the copyright, and argued she was entitled to a share of licensing revenues. *Id.* at 447-48. In support of her position that the release did not bar her claim to the copyright, plaintiff hypothetically argued that under defendant's broad interpretation of the release she would be precluded from even bringing suit against the defendant for defaming her dancing

---

[1]   Webster's defines "grow" as "to develop from a parent source". WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 539 (1987). The source from which this case and the parties' dispute developed was undeniably the 2000 accident resulting in the death of Plaintiffs' son.

[2]   Interpretation of a contract is a question of law. *Ophus v. Fritz*, 301 Mont. 447, 452 (2000). "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone[.]" MCA §28-3-303.

abilities.   In a footnote, the court found plaintiff's hypothetical inapt because defamation of her dancing ability lacked a "sufficient nexus" to the subject matter of the release, ownership rights in the film. *Id.* at 451, n. 5.

In contrast, Plaintiffs' claim that Remington defamed them in (a) its description of the 2000 inspection and testing of the Barbers' rifle and (b) its denial that the Model 700 is defective, has an undeniable nexus to that which Plaintiffs released—any and all claims that *"may in any way grow out of the Accident*[.]*"* (*See* Exhibit D p.2, §1.A).[3]

---

[3]   Although Plaintiffs appear to argue that consideration of materials outside the First Amended Complaint is improper, they admit that "Exhibits E through J are central to the claims" they pleaded. (Resp., p.3, n. 1).   Exhibits E through J are therefore incorporated by reference and properly considered under Rule 12(b)(6).   *See Knievel v. ESPN*, 223 F.Supp.2d 1173, 1176 (D.Mont. 2002).   As for Exhibits A (the 2001 Complaint), B (Remington's 2001 Statement), C (Remington's 2001 Answer) and D (the Release), Plaintiffs admit they should be judicially noticed but argue that notice of any "disputed facts" in these exhibits should not be taken. (Resp., p.3). Plaintiffs' argument ignores that Defendants have not offered Exhibits A through D for the truth of any factual matter referenced but only for the fact that they exist and the allegations, defenses, statements and agreements found in the exhibits were made.   Nor do Plaintiffs refute the other authorities and reasons for why each exhibit is properly considered on this Rule 12(b)(6) motion. (*See* Doc. 23).

**II.   Plaintiffs' Defamation Claim Fails.**

**1.   *Plaintiffs Have Not Overcome the High Bar Set by the First Amendment Right of Freedom of Speech in Attempting to Plead Defamation.***

Plaintiffs' allegations must be analyzed with an exacting eye because the "test" for a defamation action is "stringent". *Frigon v. Morrison-Maierle, Inc.*, 233 Mont. 113, 121 (1988).  For good reason:  the freedom to speak on matters of public interest is one of our most closely protected constitutional rights.  *See Williams v. Pasma*, 202 Mont. 66, 67 (1982) ("we must consider this [defamation] case against the background of a profound national commitment to the principal that debate on public issues should be uninhibited, robust and wide open, ..." (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)).

However, Plaintiffs afford little respect for Remington's constitutional right to speak in defense of the accusations made against it on national television.  And Plaintiffs' arguments, if accepted, would expose countless persons to defamation claims for merely publicly expressing disagreement with positions publicly expressed by others.  Remington's response to the CNBC program cannot rise to the level of actionable defamation without depriving Remington of its constitutional right to speak and chilling debate on a matter of public interest.

2.     *Plaintiffs Continue to Ignore and Mischaracterize the Statements Made by Remington.*

Only the words Remington actually used in response to CNBC matter in the Court's analysis of Plaintiffs' defamation claim.  Nevertheless, Plaintiffs continue to ignore those words or recite them inaccurately.  For example, Plaintiffs now for the first time say that Remington accused Plaintiffs of "lying about the safety of the Model 700 rifle." (Resp., pp.17, 23-24).  But Remington did not make that statement.  Although Remington plainly disagrees with Plaintiffs' view of the Model 700, it did not accuse Plaintiffs of "lying" and it did not state that they are "liars."  Nor can an inference be drawn that Plaintiffs have been accused of lying simply because the parties have expressed different opinions on the design and safety of the rifle.

Plaintiffs continue to represent that Remington stated that a "triggerless discharge" has "never been duplicated." (Resp., pp.16, 19).  But Remington did not make that statement; it stated that "such events" had not been duplicated on "guns returned from the field" or on "accident guns" which had been "properly maintained" and "not altered after sale." (FAC ¶44; *accord* <u>Exhibit I</u> min. 01:55-02:34; <u>Exhibit H</u> p.1).

Plaintiffs also continue to mischaracterize Remington's description of the condition and testing of the Barbers' rifle when it was inspected in 2001.  Plaintiffs do so in order to draw an inference that they "did not properly care for the rifle and

altered it in a way that caused the death of their son." (Resp., p.19).   However, even the words used by Remington plainly prevent that inference from being drawn.   Remington's description of the rifle's condition was in each instance followed by its statement that the poor maintenance and alterations did not prevent the gun from working properly:  "Even so . . . the Barber's gun worked properly when it was tested" and "Even so . . . the Barber rifle would only fire by pulling the trigger while the safety was in the fire position." (FAC ¶44; *accord* Exhibit I min. 02:48-03:46; Exhibit H p.2).   Inferences drawn from statements Remington never made cannot be actionable.[4]

### 3.   *Plaintiffs Have Not Shown That Remington's Actual Statements or the Inferences Alleged Carry a Defamatory Meaning; Nor Can Their Defamation Claim Survive the "Innocent Construction" Rule.*

Plaintiffs rely exclusively on inference and innuendo to support their argument that Remington's statements carry a defamatory meaning.      For example, Plaintiffs state that Remington's statements "can *reasonably be*

---

[4]      Remington's statement that "[n]o scientific test has ever supported the accidental discharge theory of plaintiffs' lawyers and their expert" was made in context with the statement that immediately preceded it regarding testing of "accident guns" by "both Remington and experts hired by plaintiffs' attorneys."      Regardless, what constitutes a "scientific test" and whether a test "supports" a "theory" are subjects on which persons (and certainly litigants in product liability matters) may reasonably disagree.   Moreover, statements about the testing of "guns returned from the field" generally are not of and concerning Plaintiffs. (*Compare* FAC ¶44 *with* Exhibit I min. 02:07-02:34 and Exhibit H p.1).

*interpreted* to attack Plaintiffs' honesty and integrity" (Resp., p.10); that the "only *reasonable inference*" from Remington's statements is that Plaintiffs "did not properly care for their rifle and altered it in a way that caused the death of their son" (*Id.*, p.19); and that a person "*would only be able to conclude from these statements* ... that the Barbers were solely responsible for the death of their son." (*Id.*) (emphasis added throughout).  Plaintiffs' exclusive reliance on these alleged inferences of defamatory meaning demonstrates that they have abandoned their defamation *per se* claim. *Wainman v. Bowler*, 176 Mont. 91, 94 (1978) (defamation "per se" claim based on innuendo or inference must be dismissed as a matter of law).

Moreover, "[w]hen evaluating the threshold question of whether a statement is reasonably capable of sustaining a defamatory meaning, [the court] must interpret that statement 'from the standpoint of the average reader, judging the statement not in isolation, but within the context in which it is made.'" *Knievel v. ESPN*, 393 F.3d 1068, 1074 (9th Cir. 2005).  Yet Plaintiffs make no attempt to explain why the "average reader" (as determined by the Court) would react to the CNBC program and Remington's response by shunning and avoiding Plaintiffs out of "hatred" or "contempt."  *See* MCA §27-1-802.

Gus Barbers' death was a tragic accident.  But contrary to Plaintiffs' argument, Remington's CNBC response neither stated nor suggested that his

parents were its "sole" cause. (*Compare* Resp., pp.13, 17 *with* FAC ¶44).   And even had Remington explicitly stated that Plaintiffs had some responsibility, the Court as the "average reader" could interpret that statement in any number of non-defamatory ways.

Given the context in which Remington's statements were made—responding to a television program describing the accident and the 2001 lawsuit—an "average reader" could correctly conclude that Remington simply presented its side of a litigated dispute.   An "average reader" might conceivably disagree with Remington's position based on information from the CNBC program. Alternatively, an "average reader" might be unable to reach a conclusion and attach no weight to Remington's statements at all.   Or, the Court could rightly conclude that an "average reader" would have the non-defamatory reaction to the accident that Remington actually expressed in its response to the CNBC program: "deepest sorrow for any family that suffers that kind of loss." (Exhibit I min. 03:27-03:37).   Each of these non-defamatory meanings is fatal to Plaintiffs' defamation claim.[5]

Non-defamatory reactions by the "average reader" to Remington's statements invoke the "innocent construction" rule, which is also part of the "stringent" test by which defamation claims are evaluated under Montana law.

---

[5]      In its opening brief, Remington pointed to multiple non-defamatory, "innocent constructions" (Doc. 24, p.23), which Plaintiffs have not disputed.

Under the rule, to be defamatory, a statement cannot be capable of more than one meaning, but instead must have a single, unmistakable "opprobrious" meaning. *Keller v. Safeway Stores, Inc.*, 111 Mont. 28, 31-32 (1940). If a non-defamatory construction can be given to the statement, that non-defamatory meaning prevails, and the statement is not actionable as a matter of law. *Wainman*, 176 Mont. at 95; *Anderson v. City of Troy*, 316 Mont. 39, 43 (2003) ("The language used must be susceptible to one meaning and that meaning must be opprobrious.").[6]

Plaintiffs attempt to avoid dismissal by turning the rule and its application on its head: "If only one reasonable interpretation of the statements can be considered defamatory, there is an issue of fact which should be decided by the jury." (Resp., p.11). In support of this incorrect statement of Montana law, Plaintiffs improperly rely on the *dissenting* opinion in *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005) (Bea, J., dissenting) and on *Kaelin v. Globe Communications Corp.*, 162 F.3d 1036 (9th Cir. 1998) (based on California law which does not recognize the "innocent construction" rule). (*See* Resp., pp.9-11, 19). Under a correct application of the "innocent construction" rule, Plaintiffs' defamation claims must be dismissed.

---

[6]   "Under the innocent construction rule, if a statement, given its natural and obvious meaning, can reasonably be given an innocent interpretation … it [is] not actionable." 53 C.J.S. Libel & Slander; Injurious Falsehood §33 (referencing *Anderson v. City of Troy* for proposition that Montana has adopted the "innocent construction" rule).

### 4. *Remington's Statements Regarding the Condition and Testing of the Barbers' Rifle were Privileged.*

In response to Remington's assertion of the "fair and true report" of judicial proceedings privilege (MCA §27-1-804(4)), Plaintiffs argue that the statements "were not made as part of a judicial proceeding." (Resp., p.22).   Plaintiffs ignore that Remington's statements describing the condition and joint testing of the Barbers' rifle were initially made in 2001, preliminary to the lawsuit Plaintiffs filed shortly thereafter. (Doc. 24, p.25).  Plaintiffs also ignore the cases which hold that the privilege extends to statements made "preliminary" to litigation. *See, e.g.,* *Lence v. Hagadone Inv. Co.,* 258 Mont. 433, 443 (1993).

Nor do Plaintiffs make a cognizable argument for why Remington is not afforded the "self-defense" or "reply" privilege, especially in light of Plaintiffs' explicit allegation that Mr. Barber was "one of the primary sources" for the CNBC program. (FAC ¶38).   At bottom, Plaintiffs have not met their burden to plead that Remington's statements were "unprivileged." MCA §27-1-802; *see* FAC ¶55.

Furthermore, Plaintiffs' bare assertion that Remington made its statements with "malice" does not destroy the privileged nature of Remington's response to the CNBC program. (FAC ¶60).  Specifically, Plaintiffs fail altogether to plead facts to support their conclusory allegation that Remington's description of the 2000 joint inspection and testing of the rifle was not only false, but was also known by Remington to be false. (*See, e.g.,* FAC ¶44, "Remington's responses

contained the following statements which Remington knew at the time were false"). A sufficient allegation that Remington made false statements with "actual malice" about the Plaintiffs (who admittedly are limited purpose public figures) is a *prima facie* element of their defamation claim, (*see* Doc. 24, §II.A.7; MCA §§27-1-802), and is also necessary to overcome the privileged nature of Remington's statements. (MCA §§27-1-804(4)).

Again, the words that Remington actually used to describe the condition and testing of the rifle should be the focus of the Court's analysis, not words that Plaintiffs imagined were said. With regard to the presence of rust, Remington stated the "gun" and the rifle's "action" were rusted. (FAC ¶44; *accord* Exhibit I min. 02:50-03:01; Exhibit H p.2, "rusted action"). Although Plaintiffs admit "the rifle was found to have rust[,]" they incorrectly allege Remington stated the "fire control" was rusted. (*See* FAC ¶45). However, Remington made no reference to a rusted "fire control" in its statements. Plaintiffs have set up a straw man, only to knock it down.

Plaintiffs engage in the same tactic when they allege that "[c]ontrary to Defendants' public statements … [the experts at the joint inspection] … found that … the fire control adjustments were all within factory specifications, including the adjustment for sear/connector engagement." (FAC ¶45). But Remington did not state that the "sear/connector engagement" or any component of the rifle was out

of factory specification.  Rather, Remington stated there was evidence that certain components had been "adjusted, or removed and reinstalled." (FAC ¶44; *accord* <u>Exhibit I</u> min. 02:50-03:01).

With regard to the testing performed by the experts at the joint inspection, Plaintiffs allege that their expert "did conclude" that the rifle fired "without a trigger pull." (FAC ¶45).   But Remington made no statement regarding any "conclusion" that Plaintiffs' expert may have formed.  Remington only stated that "the gun worked properly *when it was tested*" by the experts during the joint examination. (FAC ¶44; *accord* <u>Exhibit I</u> min. 03:03-03:27) (emphasis added). Whether Plaintiffs' expert nevertheless concluded that the rifle fired without a trigger pull *when the accident occurred* is an entirely different matter, on which Remington did not comment.

When Plaintiffs' inaccurate characterizations of Remington's words are set aside, all that remains is a conclusory allegation that Remington "knew" that each and every statement it made in response to the CNBC program was "false." (FAC ¶44).   Simply reciting an element of a cause of action is not entitled to the presumption of truth under Rule 8. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  And Plaintiffs' argument that privileges do not apply to Remington's statements because they have recited the word "malice" in their complaint should

be rejected. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (threadbare recitals are insufficient).

### III.    Plaintiffs' Intentional Infliction of Emotional Distress claim fails.

Plaintiffs' only response to Defendants' arguments regarding the intentional infliction of emotional distress ("IIED") claim is to say that Defendants have incorrectly presented the law.   However, Plaintiffs have built their emotional distress claim exclusively on Defendants' alleged "defamatory statements" (¶68) and "false public statements" (FAC ¶¶62, 63)—the same foundation as their defamation action.  Thus, where Plaintiffs' defamation claim fails, so too does their claim for emotional distress.

Montana law sets a high bar for the level of distress which can support a tort action.   Plaintiffs' entirely conclusory accusation that allegedly false and defamatory statements caused them "serious or severe emotional distress" (¶62) falls short of that bar.  Only "extreme" emotional distress can give rise to liability; it must be "so severe that no reasonable [person] could be expected to endure it." *Sacco v. High Country Indep. Press, Inc.*, 271 Mont. 209, 220 (1995).

To allow an IIED claim here would mean that anyone whose view has been questioned in a public disagreement may be compensated for the unpleasantness associated with being challenged.   That would be particularly inappropriate where

the alleged tortious statements were made in response to the CNBC program, for which the Barbers claim to be a primary source of information.

## IV.    A Coordinated Defense Agreement does not Create a Conspiracy.

The conspiracy claim merits little additional discussion.  As their only allegation, Plaintiffs continue to cite an unremarkable claims handling agreement among Defendants from 1993, stating that the arrangement "would not be the standard course of action" in product defect cases. (Resp., p.25).  This argument is a baseless stretch and ignores that such agreements are frequently reached when common legal interests exist.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that Plaintiffs' First Amended Complaint be dismissed in its entirety with prejudice.

DATED this 21st day of November, 2012.

Respectfully submitted,

s/ *Robert M. Carlson*
Corette Pohlman & Kebe
Attorney for Defendants

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing brief is double-spaced, in 14 point Times New Roman typeface, and the word count, calculated by Microsoft Office Word

2007, is 3,218 words, excluding the Caption, Certificate of Service, and Certificate of Compliance.

s/ <em>Robert M. Carlson</em>
Corette Pohlman & Kebe
Attorney for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of November, 2012, a copy of the foregoing document was served on the following persons by the following means:

<u>1, 2 and 3</u> by and through the Electronic Case Filing System.

1.   Clerk, U.S. District Court

2.   Richard Ramler
     Ramler Law Office, P.C.
     202 West Madison Avenue
     Belgrade, MT 59714
     RichardRamler@aol.com

3.   Jon D. Robinson
     BOLEN, ROBINSON & ELLIS, LLP
     202 South Franklin Street, 2nd Floor
     Decatur, IL 62523
     jrobinson@brelaw.com

/s/ <em>Robert M. Carlson</em>
Corette Pohlman & Kebe
Attorneys for Defendants
