IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | | |
|---|---|---|
| RICHARD BARBER and BARBARA BARBER, | ) ) ) | CV 12-43-BU-DLC |
| Plaintiffs, | ) ) | |
| vs. | ) ) | ORDER |
| REMINGTON ARMS COMPANY, INC., SPORTING GOODS PROPERTIES, INC., and E. I. DuPONT DE NEMOURS AND COMPANY, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

The First Amended Complaint in this matter alleges claims of defamation and slander, intentional infliction of emotional distress, and civil conspiracy. The latter two claims rely on the success of the defamation count; it is alleged the conspiracy was furthered by and the emotional distress was caused by the

-1-

defamation.

Defendants Remington Arms Company, LLC (formerly "Remington Arms Company, Inc.," and hereinafter "Remington"), Sporting Goods Properties, Inc., and E.I. Du Pont De Nemours and Company (collectively, "Defendants"), have filed a motion to dismiss the First Amended Complaint.  They argue that Plaintiffs Richard and Barbara Barber ("the Barbers") fully released their claims as part of a 2002 settlement agreement with Defendants.  Alternatively, they argue that the Barbers' claims do not state causes of action under Montana law.  For the reasons discussed below, Defendants' motion is granted on the grounds that the present claims were fully released in 2002.

**I.**

In reviewing a motion to dismiss, the court may consider "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."  *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir. 2003) (citations omitted).  The Ninth Circuit has extended the incorporation by reference doctrine to include "situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even

though the plaintiff does not explicitly allege the contents of that document in the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Information is incorporated into the complaint "where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (holding that the legal sufficiency of a conversion claim depended on the terms of a billing agreement, which it then considered as integral to the complaint).

Defendants argue that ten exhibits are properly subject to judicial notice or consideration. (Docs. 8-1 through 8-10.) Plaintiffs do not contest the authenticity of any of the documents. Nor do they contest the propriety of considering Exhibits E through J. Exhibit E is subject to judicial notice as a court pleading. *Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). Exhibits F through J may be considered as published news reports and press releases, *In re American Apparel, Inc. Shareholder Litigation*, 855 F. Supp. 2d 1043, 1062 (C.D. Cal. 2012) (citing cases), and because their contents were alleged and relied on in the Amended Complaint, *Knievel*, 393 F.3d at 1076.

Exhibits A through D concern prior litigation between the parties. Plaintiffs

argue they should not be considered because they are not subject to judicial notice under Rule 201 of the Federal Rules of Evidence or they are not central to the Amended Complaint. While the Court agrees that it cannot take judicial notice of any facts that are subject to reasonable dispute and alleged in these documents, Fed. R. Evid. 201(b), each exhibit is properly subject to the Court's consideration.

Exhibit D is a Resolution Agreement and Release the parties entered in 2002. The Barbers did not explicitly reference the settlement agreement in their Amended Complaint.[1] However, they do not dispute its authenticity or validity, and though they insist their claims are not encompassed by the release, they do not dispute its relevance. *Coto Settlement*, 593 F.3d at 1038. The release is integral to the Amended Complaint. If the Barbers' claims fall within its scope, they are barred; they are not barred if they do not fall within its scope. Plaintiffs had notice of the settlement agreement and its terms, and their Amended Complaint necessarily relies on the release not encompassing their present claims. *See RBS Holdings, Inc. v. Wells Fargo Century, Inc.*, 485 F. Supp. 2d 472 (S.D.N.Y. 2007).

---

[1] In their original complaint, the Barbers acknowledged that they "resolved their claims against Defendants for their son's death" and pleaded that this suit was "not for any claim resolved by them in 2002." (Doc. 1 ¶¶ 41, 43.) "When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extrajudicial admission made by a party or his agent." *Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir.1996) (citations omitted).

Thus, the settlement agreement is properly considered under the incorporation by reference doctrine.

Exhibits A and C are the Complaint and Answer from the 2001 action between the parties, *Barber v. Remington Arms Company, Inc., et al.*, No. 01-CV-83-BU-LBE (D. Mont. 2001). These documents are subject to judicial notice as public records. A court "may take judicial notice of proceedings in other courts, both within and without the federal judiciary system, if those proceedings have a direct relation to matters at issue." *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007) (internal quotation and citations omitted); *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001) (a court may take judicial notice of court records, but judicial notice may not extend to the truth of facts asserted in those records). Exhibits A and C are directly related to the issue of whether the release the parties entered in 2002 bars Plaintiffs' present claims. They show what allegations, defenses, and statements were made prior to the 2002 settlement and are considered for the fact that the statements were made, not for the truth of the matters asserted.

Exhibit B is a formal published statement that Remington made about the 2001 litigation. It is properly considered as a press release, *In re American Apparel, Inc. Shareholder Litigation*, 855 F. Supp. 2d at 1062, again for the fact

that the statements were publicly made, not for their truth.

In summary, each of the documents presented by Defendants may be considered in deciding the motion to dismiss.

## II.

On October 23, 2000, nine-year-old Gus Barber tragically died when a Remington Model 700 rifle accidentally discharged as it was being handled by his mother. According to the Barbers, the rifle fired when Barbara released the safety in order to unload the rifle, even though she did not touch the trigger. The bullet passed through the Barbers' horse trailer and struck Gus, who was out of sight.

In 2001, Richard and Barbara were interviewed by CBS Evening News Eye on America for a three-part series that was was broadcast nationwide. The three segments were entitled "A Deadly Flaw," "Fixing a Fatal Flaw," and "Remington Model 700: Friend or Foe."

On January 25, 2001, Remington issued a press release that read, in part:

> When used following the rules of safe gun handling, including proper maintenance, always keeping the muzzle pointed in a safe direction and not inappropriately altering the mechanism, the Remington Model 700 is a safe and reliable rifle. . . .
>
> [W]e do think it is important to note that the rifle involved in the Barber shooting was manufactured in 1972 and, as we understand, acquired by Mr. Barber used 10 to 12 years ago.

Several weeks after the accident, representatives from Remington and

> the Barbers conducted a preliminary examination of both the condition and the performance of the rifle. Among other abnormal conditions, the inspection found the inside of the rifle to be heavily rusted, and the trigger engagement screw, safety lever, and fire control mechanism had all been either adjusted or removed and reinstalled after the rifle left the factory. As to its performance, the rifle passed all the function tests performed in this preliminary inspection, and fired only when the mechanical safety was in the "fire" position and the trigger was pulled.
>
> In light of this tragic accident, Remington will be redoubling its efforts to educate hunters in the safe use and proper maintenance of the rifle and of all firearms. . . .

(Doc. 8-2 ("Remington's 2001 statement").)

In December 2001, the Barbers filed suit against Defendants, raising claims based on theories of product liability, failure to warn, negligence, breach of warranty, infliction of emotional distress, spoliation of evidence, and failure to recall or retrofit. (Doc. 8-1.) Defendants denied the allegations and asserted, among other affirmative defenses, that "the alleged injuries and damages of the plaintiffs were caused solely by the negligent conduct of persons or entities other than the defendants," that some of the claims were barred or reduced in proportion to the amount of negligence attributable to Plaintiffs, and that the claims were barred because the rifle had been altered and was not in the same condition as it was when it was placed into the stream of commerce. (Doc. 8-3.)

On June 19, 2002, the parties entered a Resolution Agreement and Release. In exchange for payment, the sum of which is confidential under the terms of the

Agreement, Plaintiffs agreed to a general release:

> A.  In consideration of the payments set forth in the "Payments" section of this Resolution Agreement, Plaintiffs hereby completely release and forever discharge the Defendants from any and all past, present, or future claims, demands, obligations, actions, causes of action, wrongful death claims (Section 27-1-513, M.C.A.), survival action claims (Section 27-1-501, M.C.A.), damages, personal injuries or disabilities of any nature whatsoever, including all claims for physical pain and suffering, mental anguish, emotional distress, grief, permanent disability, loss of income, loss of enjoyment of life, rights, costs, loss of services, and expenses, including, but not limited to, any and all medical, hospital, and compensation of any nature whatsoever, whether based on a tort, contract, or other theory of recovery, which the Plaintiffs now have, or which may hereafter accrue or otherwise be acquired, on account of, or may in any way grow out of the Accident, or which are the subject of the Complaint (and all related pleadings), including, without limitation, any and all known or unknown claims for bodily and personal injuries to Plaintiffs, or any future wrongful death claims of Plaintiffs' representatives or heirs, which have resulted or may result from the Accident and any alleged acts or omissions of the Defendants.
>
> . . . .
>
> C. This release, on the part of the Plaintiffs, shall be a fully binding and complete resolution among the Plaintiffs and the Defendants, and their heirs, assigns, and successors.
>
> D. The Plaintiffs acknowledge and agree that the release and discharge set forth above is a general release. Plaintiffs expressly waive and assume the risk of any and all claims for damages which exist as of this date, but of which the Plaintiffs do not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect Plaintiffs' decisions to enter into this Resolution Agreement. The Plaintiffs further agree that Plaintiffs have accepted payment of the sums specified herein as a complete compromise of matters involving disputed issues of law and fact.  Plaintiffs assume the risk that the facts or law may be other than what Plaintiffs believe. It is

> understood and agreed to by the parties that this resolution is a compromise of a disputed claim, and the payments are not to be construed as an admission of liability on the part of the Defendants, by whom liability is expressly denied.

(Doc. 8-4 at 2–4.)

Richard Barber, and occasionally Barbara, have since continued to engage in extensive publicity about the accident and the Model 700 rifle. Richard has been featured in numerous news articles and stories and has written articles, posted information on the internet, and spoken publicly about his belief that Gus's death was caused by a design defect in the rifle's Walker fire control system. Richard has obtained "thousands of pages of Remington's internal documents," and he seeks to demonstrate that Remington has been aware of the design defect for years.

In October 2010, the Barbers both appeared in "Remington Under Fire: A CNBC Investigation," a documentary about the design defect theory. Richard was one of the primary sources for the broadcast, which featured Gus's story as well as the stories of others who have experienced similar incidents involving the Model 700 rifle.

Remington produced two responses to the program, a video response (*see* Transcript, doc. 8-10) and a written response (doc. 8-8). In the responses, Remington counters some of the assertions made in the CNBC program and

provides additional information.

The Barbers allege that Remington's responses were defamatory and slanderous. They claim that Remington knew the following statements were false:

> [B]oth Remington and experts hired by plaintiffs' attorneys have tested accident guns which were alleged to have fired without a trigger pull and neither has ever been able to duplicate such an event on guns which had been properly maintained and which had not been altered after sale. No scientific test has ever supported the accidental discharge theory of plaintiffs' lawyers and their expert. That's true, even with a gun at the center of the CNBC report. The reporter tells the compelling story of the Barber family, who lost their son in a hunting accident a decade ago.

(Transcr. video response, doc. 8-10 at 2 (paragraph breaks in transcript omitted).) They also argue that Remington's statements that the Walker fire control system can only fire without a trigger pull if the rifle has been improperly modified or maintained can "reasonably be interpreted only to say that the Barber rifle fired because of a trigger pull or because it was improperly maintained or improperly modified." (Doc. 13 at 18.) Thus, they assert that Remington "publicly blamed Richard and Barbara for the death of their son Gus" and implied they were "solely responsible" for his death. (*Id.* at 18, 21.) In their response to the motion to dismiss, the Barbers additionally claim that Remington's statements "were clearly designed to convince their audience that the Barbers were lying about the safety of the Model 700 rife and Remington's knowledge that the firearm is defective." (Doc. 29 at 23.)

-10-

### III.

### A. Standard of Review

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "The issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978), cert. denied, 441 U.S. 965 (1979). A prior settlement agreement may preclude a plaintiff from raising related claims. *Arnold v. United States*, 816 F.2d 1306, 1309 (9th Cir. 1987). A 12(b)(6) motion is thus appropriate to test whether a complaint is barred by a prior settlement agreement between the parties. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 (9th Cir. 2012) (dismissing the case because a prior release precluded the plaintiff from bringing related claims in a subsequent lawsuit).[2]

---

[2] The Ninth Circuit has also held that where an action is barred by a settlement agreement, the action is moot, because the "parties lack a legally cognizable interest in the outcome." *E.E.O.C. v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1542 (9th Cir. 1987). Where there is no legally cognizable interest at stake, federal courts lack jurisdiction because their constitutional authority is limited to cases and controversies. *Id.*

**B. Release**

Settlement agreements are contracts and are governed by the principles of contract law. *Murphy v. Home Depot*, 270 P.3d 72, 74 (Mont. 2012). Once a settlement is reached, it is legally enforceable. *Id.*

> A party to a settlement agreement is bound if he or she manifested assent to the agreement's terms, and has not manifested an intent not to be bound. In other words, a party is bound if he or she unconditionally consented to the agreement. A party's latent, or undisclosed, intention not to be bound does not prevent the formation of a binding contract.

*Murphy*, 270 P.3d at 74 (internal citations omitted). If a contract is unambiguous, the Court must enforce its plain meaning. *Summer Night Oil Co., LLC v. Munoz*, 259 P.3d 778, 781 (Mont. 2011) (citation omitted); *Rich v. Ellingson*, 174 P.3d 491, 495 (Mont. 2007). Only if a contract is ambiguous may the Court review extrinsic evidence to determine the meaning of the writing or construe the intentions of the parties. *Rich*, 174 P.3d at 495; *Adams v. Maynard*, 264 P.3d 517, 517 (Mont. 2011) (finding a release was ambiguous because, in the same document, one party released all claims against the other and reserved some claims).

The public policy of the State of Montana is to encourage settlement and avoid unnecessary litigation. *Miller v. St. Farm Mut. Auto. Ins. Co.*, 5 P.3d 1278, 1281 (Mont. 2007) (citations omitted); *Hohensee v. Chemodurow*,470 P.2d 965,

967 (Mont. 1970) ("The law favors the settlement of disputes out of court, either before or after an action is begun, and when the parties are shown to have made a valid settlement they will be held thereto, in the absence of fraud or mistake."). Thus, the language of a release will be given effect to include all possible claims even if they are not specifically mentioned. *Hohensee*, 470 P.2d at 967. The releasor's "latent discontent with the release cannot be grounds for alteration of an express agreement." *Hanson v. Oljar*, 752 P.2d 187, 189 (Mont. 1988) (internal quotation marks and citation omitted).

    Here, the Barbers agreed to a broad, general release in 2002, and they did not reserve any claims. *Murphy*, 270 P.3d at 74; *Hetherington v. Ford Motor Co.*, 849 P.2d 1039, 1043 (1993). They released Defendants from liability not only for the specific claims raised in their 2001 complaint, but also for any other claims they could have brought, as well as any "future" claims "which may hereafter accrue or otherwise be acquired, on account of, or may in any way grow out of the Accident . . . including, without limitation, any and all known or unknown claims . . .which have resulted or may result from the Accident and any alleged acts or omissions of the Defendants." (Doc. 8-4 at 2–3.) The terms of the Release are not ambiguous, and the Court's consideration is thus confined to the plain meaning of the Release itself. *Skilstaf, Inc.*, 669 F.3d at 1017 ("A party's assertion of

ambiguity does not require the district court to allow additional opportunities to find or present extrinsic evidence if the court considers the contract language and the evidence the parties have presented and concludes that the language is reasonably susceptible to only one interpretation.").

The Barbers insist that the present claims did not "grow out of the Accident" because they concern statements made by Remington in 2010. The Court disagrees. Even though the statements were published several years after the previous litigation and settlement, they grew directly out of the Accident and concern the same factual and legal issues that were in dispute in 2001 and 2002.

In the 2002 Resolution Agreement and Release, the parties acknowledged they were settling a matter that was still disputed and that Defendants did not admit and in fact expressly denied liability. (Doc. 8-4 at 3.) Nonetheless, the Barbers "accepted payment . . . as a complete compromise of matters involving disputed issues of law and fact," and they "assume[d] the risk that the facts or law may be other than what [they] believe[d]." (*Id.*)

Among the disputed issues were whether there was a design defect in the Model 700, the condition of the Barbers' rifle, and who or what caused Gus's death. Plaintiffs claimed the rifle, as designed, was in a defective condition (doc. 8-1 at 6); Defendants denied this and declared it was safe and reliable (doc. 8-3 at

-14-

4; doc. 8-2). Plaintiffs asserted their own rifle was in substantially the same condition as it was when it was manufactured by Defendants (doc. 8-1 at 6); Defendants disagreed, stating there were abnormal conditions, including rust, and that "the trigger engagement screw, safety lever, and fire control mechanism had been either adjusted or removed and reinstalled after the rifle left the factory" (doc. 8-3 at 8; doc. 8-2). Finally, Plaintiffs maintained the rifle was used in a reasonably foreseeable manner (doc. 8-1 at 7), but Defendants countered it was misused and suggested it had been improperly maintained or inappropriately altered (doc. 8-3 at 7; doc. 8-2). These disputed issues of fact and law were explicitly resolved by the parties in the 2002 Resolution Agreement and Release.

      The 2010 statements which the Barbers allege are defamatory concern the exact same subject matter. (Doc. 13 at 18–20.) They reprise the litigation position that Defendants took in 2001 and 2002 and repeat statements that Remington published in its 2001 press release. They concern the same accident, the same rifle, the same parties, and the same disputes over responsibility, the condition of the Barbers' gun, and whether there is an inherent defect in the rifle. Accordingly, the Barbers' present claims arise directly out of the accident and the matters contemplated in the 2002 agreement. Additionally, under the Barbers' theory of defamation, the claims could have been raised in the previous lawsuit based on the

2001 press release that Remington published.

This case is thus distinguishable from the Ninth Circuit's footnote in *Marder v. Lopez*, 450 F.3d 445, 451 n. 5 (9th Cir. 2006) about a hypothetical defamation claim. In that case, the plaintiff had signed a release discharging Paramount Pictures from claims arising out of the creation of the film *Flashdance*, which was based on her life story. *Id.* at 447. Several years later, a music video was produced that included re-creations from several scenes in *Flashdance*. *Id.* Marder filed an action seeking to assert her rights as a co-author of the movie and a co-owner of the copyright. *Id.* at 448. The Ninth Circuit held that her claims were precluded by the earlier release even though they arose after the release was signed:

> The Release's language is exceptionally broad and we hold that it is fatal to each of Marder's claims against Paramount. Such a release of 'each and every claim' covers all claims within the scope of the language, absent extrinsic evidence to the contrary.

*Id.* at 449 (construing California law). The court rejected Marder's argument that such a broad interpretation of the release would even preclude her from bringing suit if Paramount defamed her dance routine. *Id.* at 451 n.5. The court noted that the hypothetical lacked a "sufficient nexus" to the "matters" contemplated by the release—the ownership of her contributions to *Flashdance*. *Id.* Here, on the other hand, the same matters resolved by the 2002 Release—the disputed facts and law

-16-

at issue during the 2001 litigation—are the subject matter of the current lawsuit. There is a direct nexus between the disputed issues the Barbers agreed to resolve in 2002 and their current claims.

When the Plaintiffs negotiated a settlement of these disputed issues, they expressly recognized that the facts might be other than what they believed at the time. (Doc. 8-4 at 3.) Thus, Defendants' alleged knowledge concerning problems with the Walker fire control does not alter the effect of the Release. The parties did not agree to refrain from speaking publicly about the disputed issues ever again; the Agreement's confidentiality clause is limited to the payment the Barbers accepted in return for agreeing to the Release. (Doc. 8-4 at 10.) Permitting the Barbers to avoid the Release by raising a defamation claim would effectively put a gag order on every settlement of a disputed issue—if a party ever spoke again about its position, it would be vulnerable to a defamation suit on the grounds that someone could reasonably infer it was suggesting the other party was lying. This would be destructive of the finality of the settlement process and would contravene Montana's policy of favoring settlement.

## IV.

The language of the 2002 Release "[f]rom beginning to end, ... consistently demonstrates the intent of the parties to resolve all disputes arising from [the

-17-

Accident], known or unknown, anticipated or unanticipated, regardless of the particular complaint alleged," and "no reservations were made as to present or future claims against [the defendant]." *Rich*, 174 P.3d at 496. Because the present lawsuit shares the same "factual predicate" as the 2001 dispute, *see Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 749 (9th Cir. 2006) (affirming dismissal of a class action against credit card companies predicated on the same price-fixing predicate and injury as claims settled in an earlier class action, even though the subsequent suit "posit[ed] a different theory of anti-competitive conduct"), and bears a "sufficient nexus" to the matter contemplated in the release, *Marder*, 450 F.3d at 451 n. 5, the claims raised here are barred.

Accordingly, IT IS ORDERED that Defendant's motion to dismiss the First Amended Complaint (doc. 23) is GRANTED. The First Amended Complaint (doc. 13) is DISMISSED WITH PREJUDICE. All pending motions are DENIED as moot, and all deadlines are VACATED. This case is closed.

Dated this 11th day of February 2013.

_____
Dana L. Christensen, District Judge
United States District Court